# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

RICHARD J. FORD, )
                 )
and )
                 )
FEDSYS, INC. )
14255 US Highway 1 )
Suite 215 )
Juno Beach, FL 33408 )
                 )
       Plaintiffs, )
                 )
       v. )
                 )
JERRY W TORRES, )
                 )
and )
                 )
TORRES ADVANCED ENTERPRISE )
SOLUTIONS, LLC )
2111 Wilson Boulevard )
Suite 700 )
Arlington, Virginia 22201 )
                 )
       Defendants. )
_____ )

Case No. 1:08CV1153-Jcc/JFA

Serve:

WILLIAM QUINTON ROBINSON, ESQ.
Registered Agent
4020 University Drive
Suite 300
Fairfax, Virginia 22030

## COMPLAINT

### Preliminary Statement

1.      This is a civil action brought by Plaintiffs FedSys Inc. and Richard Ford ("Rick Ford") against Defendants Torres AES and Jerry Torres for breach of contract, quantum meruit, tortuous interference with contractual expectancy, violation of the

Virginia Computer Crimes Act, violation of the federal Computer Fraud and Abuse Act, violation of the Virginia Trade Secret Act and Defamation per se.

## Jurisdiction and Venue

2.     Jurisdiction in this case is proper pursuant to 28 U.S.C. § 1332. Diversity is complete.

3.     Venue in this case is proper pursuant to 28 U.S.C. § 1391.

## The Parties

4.     Rick Ford is a citizen of the state of Florida and resides in Palm Beach, Florida.

5.     FedSys, Inc. is a Florida Corporation, authorized to do business in the Commonwealth of Virginia.

6.     Jerry Torres is a citizen of Virginia and resides in Arlington, Virginia.

7.     Torres AES is a Delaware limited liability company, doing business in the Commonwealth of Virginia, with its principal place of business in Arlington, Virginia.

8.     FedSys is, among other things, in the business of providing linguistic, translation, interpretation, special advisory, information technology, intelligence, and program management services to the United States government, Department of Defense and contractors and subcontractors to the United States government and the Department of Defense.

## 2005 Agreement

9.     Torres AES and FedSys entered into a Placement and Fee Agreement, effective August 15, 2005 ("the 2005 Agreement", attached as Exhibit 1).

10.     Under the 2005 Agreement, FedSys agreed to "register and refer qualified candidates to Torres AES" that would "perform contractual duties on behalf of the U.S. Government under Titan Corporation Prime Contract (INSCOM) W911W4-04-D-0005 (Titan contract), Torres AES Task Order 001 or other contract which Torres may be providing services under."

11.     Under the 2005 Agreement, FedSys was to utilize candidate registration procedures which were "defined by Torres AES and/or the Titan Corporation, and/or other entity."

12.     Throughout the duration of the 2005 Agreement, the procedures to be used by FedSys were defined by Titan and communicated to FedSys by Torres AES.

13.     FedSys fully complied with the procedures defined by Titan and communicated by Torres AES.

14.     The 2005 Agreement also obligated FedSys to "support . . . candidates throughout their evaluation and in-processing period leading up to qualification for deployment to their respective areas of operations."

15.     FedSys provided support to the candidates under the 2005 Agreement including scheduling candidates for their language tests, coordinating background checks, assisting with scheduling medical screening, assisting in the completion of paperwork and being available to answer candidates' questions throughout the process.

16.     The 2005 Agreement obligated Torres AES to compensate FedSys by paying "commissions for qualified candidates referred to Torres AES by FedSys" based upon a payment schedule in the Agreement which entitled FedSys to a certain percentage of a candidates first year salary and also a percentage of a candidate's second year salary.

17. The 2005 Agreement gave FedSys the option of receiving the commission on the first year salary in one payment or prorated over the term of the contract. FedSys selected their commissions to be paid in one payment on the first year salary.

18. Jerry Torres represented to Rick Ford that if FedSys formed a strategic relationship with Torres AES, FedSys would receive 49% of all business that FedSys assisted in obtaining.

19. Additionally, in exchange for forming a strategic relationship, Jerry Torres agreed to assist FedSys in becoming a direct subcontractor on either prime contracts which Torres AES maintained, or prime contracts administered by others on which Torres AES was also a subcontractor.

20. Specifically, Jerry Torres promised that he would have FedSys added as a subcontractor to L3 Titan Corporation ("Titan") for the Iraq and Afghanistan Linguist contracts, as well as to SOSi International, Ltd. ("SOSi") as a subcontractor on the IQATF program.

21. FedSys did form a strategic relationship with Torres AES and fulfilled its obligation to obtain new business for Torres AES as either a prime contractor or a subcontractor. In turn, Torres AES was to assist FedSys in joining the same teams on an equal and proportionate level.

22. Jerry Torres and Torres AES did not honor their agreement.

23. By its own terms, the 2005 Agreement would expire when terminated "by either party upon ten (10) days prior written notice to the other party."

24. While the 2005 Agreement was effective, Torres AES hired the following candidates to work on the Titan contract: Raquel Alnomani, Sam Kenan, John Marogen,

Marina Michael, Majdie Oksten, Abdulabba Salemiyan, Ahmed Alaaedi, Mohammed Al-Ahmed, Mohamed Elgousi, Ziad Kuffa, Camilia Sadik, Fayez Salaita, Jerry Jackson, Carey Lamm, Roshan Toma, Sam Zaki, Waad Nasouri, and Nadia Zia ("the known 2005 candidates").

25.     Upon information and belief, Torres AES hired additional candidates referred and registered by FedSys ("the unknown 2005 hires"), but did not communicate the fact of their hiring to FedSys.

26.     On or about September 13, 2006, Jerry Torres contacted Rick Ford via email and indicated his intent to terminate the 2005 Agreement and enter into a new agreement in order to change payment terms.

27.     As he did during the negotiations of the earlier 2005 Agreement, Jerry Torres continued to represent to Rick Ford that if FedSys continued a strategic relationship with Torres AES, Torres AES would subcontract to FedSys 49% of all business that FedSys assisted with or have FedSys added as a direct subcontractor on either Prime contracts Torres AES maintained or Prime contracts administered by others to which Torres AES was a subcontractor.

28.     Specifically, Jerry Torres promised that he would have FedSys added as a subcontractor to Titan on both the Iraq and Afghanistan Linguist contracts, as well as a subcontractor on SOSi's IQATF program.

29.     Jerry Torres acknowledged these agreements in his email to Rick Ford on November 08, 2006.

30.     In reliance on Torres' promises, FedSys entered into a strategic relationship with Torres AES under the following terms: FedSys would obtain new

business for Torres AES either as a prime contractor or a subcontractor, and Torres would assist FedSys in joining the same team(s) on an equal and proportionate level.

31.     FedSys honored its obligation to Torres AES and Jerry Torres by assisting Torres AES in obtaining new business.

32.     Jerry Torres and Torres AES did not honor their agreement.

33.     Jerry Torres misrepresented his efforts to assist FedSys, and rather, communicated to other companies false information to discredit FedSys and Rick Ford and to prevent the other companies from working with FedSys.

34.     In addition, Jerry Torres continually misled FedSys and Rick Ford with regard to his efforts to perform under the parties' strategic partnership agreement, by alleging the existence of additional requirements which needed to be met prior to performance.

35.     Specifically, Jerry Torres claimed that neither the State Department nor SOSi would allow FedSys to become a subcontractor under the existing State Department language contract unless Rick Ford changed the name of FedSys to Torres Federal Systems, Inc. Jerry Torres promised that FedSys would be added as a direct subcontractor if the name change were in place.

36.     In an email sent or about November 30, 2006, Jerry Torres provided Rick Ford a detailed list of pay rates, billing rates, and contractual partners for which FedSys would be eligible should FedSys comply with the name change.

37.     In reliance on Jerry Torres' promise of a contractual opportunity with the Department of State and SOSi under IQATF, Rick Ford caused FedSys to file the

appropriate paperwork with the Florida Department of State on September 27, 2006, changing the name of FedSys to Torres Federal Systems, Inc., effective October 1, 2006.

38. Jerry Torres never honored this strategic relationship agreement.

**2006 Agreement**

39. On or about October 24, 2006, Torres AES and Torres Federal Systems, Inc. (hereinafter "FedSys" for purposes of clarity) entered into a Placement Fee Agreement with an effective date of October 1, 2006 ("the 2006 Agreement," attached as Exhibit 2).

40. Like the 2005 Agreement, the 2006 Agreement obligated FedSys to "refer qualified candidates" for certain contracts "to Torres AES and . . . provide certain support throughout the candidate – applicant – employment life cycle." FedSys' obligations under the 2006 Agreement were substantially the same as its obligations under the 2005 Agreement.

41. The "processes, procedures and tools" to be used by FedSys in pre-qualifying candidates were to be defined by Torres AES based upon the specifications of the prime contract under which a candidate would work.

42. The 2006 Agreement was specific to contracts included in Appendix A of that Agreement.

43. Like the 2005 Agreement, the 2006 Agreement also obligated Torres AES to pay placement fees to FedSys for the candidates who became successfully employed under a contract.

44. Unlike the 2005 Agreement, however, the payment terms under the 2006 Agreement were determined, first, by whether Torres AES had provided any "recruitment

support" in securing the candidate, and second by FedSys' election to receive a percentage of a candidate's salary over successive years, or a higher percentage of a candidate's salary for the first year only.

45.     Under the 2006 Agreement, if Torres provided "recruitment support" to a candidate, FedSys was entitled to 4.0% and 3.0% percent of a candidate's salary for the first and second years of a candidate's employment, respectively, or FedSys could elect to take 6.5% of the candidate's first year salary.

46.     In a situation where Torres did not provide "recruitment support," FedSys was entitled to 5.5%, 4.0%, and 2.5% of the candidate's salary for the first, second and third years of employment, respectively, or FedSys could elect to take 8.0% of the candidate's first year salary.

47.     In invoicing for candidates provided under the 2006 Agreement, FedSys always elected the higher-percentage, first-year option.

48.     By email of September 28, 2006, Jerry Torres confirmed to Rick Ford that FedSys' election of the higher 8% commission rate would not be affected by the advertising or the employee support afforded to FedSys by Torres AES.

49.     By its own terms, the 2006 Agreement was terminable at the will of either party.

50.     As FedSys recruited candidates referred to work on the Titan contract, FedSys caused each candidate's name and social security number to be inputted into the Worldwide Linguist Services Environment database ("WLSE").

51.     As each candidate's information was entered into the WLSE, the entering party could note whether the candidate had been previously entered by another recruiter.

52. If a candidate had been entered by another recruiter, that candidate was "not free to pursue." If a candidate had not been entered by another recruiter, that candidate was "Free to Pursue."

53. As a recruiting entity, FedSys earned its commission when a candidate completed screening, became eligible to work on a contract, and was hired onto the contract.

54. During the tenure of the 2006 Agreement, Torres AES hired the following FedSys-originated candidates to work on the Titan Contract: Yousif Abraham, Frank Marcus, and Salim Qamar ("the 2006 Titan hires").

55. During the tenure of the 2006 Agreement, Torres AES hired the following candidates to work on the Oracle Contract: Sam Kareen, Raquel Frame, Waheed Mustfa, Hamzeh Hamarneh, Christopher Britto, Samer Hamarneh, Samer Qardan, Nakhla Al-Hawi, Randy Stiles, and Samer Al-Naljar ("the 2006 Oracle hires").

56. Upon information and belief, there were unknown qualified candidates, in addition to the 2006 Titan hires and the 2006 Oracle hires, provided by FedSys and assigned by Torres AES to its own contracts or those of its partners under the 2006 Agreement ("the unknown 2006 candidates").

57. By email of September 28, 2006, Jerry Torres confirmed to Rick Ford that each candidate pre-qualified and referred to Torres AES by FedSys was provided with no "recruitment support" from Torres.

58. FedSys invoiced Torres AES for the commissions known to be due under the 2006 Agreement, but Torres AES neither paid the invoices nor provided FedSys with

salary data needed to calculate the remaining amounts due to FedSys by Torres under the 2006 Agreement.

### Breakdown in Relationship

59.     In late 2006, FedSys made repeated requests for payment and information to Torres AES on the status of candidates recruited and referred by FedSys. Many of these requests were made by Rick Ford, directly to Jerry Torres.

60.     By email of January 11, 2007, Jerry Torres told Rick Ford, "Please only work through me for payments of invoices, etc. We will look at working out a final payment for your services. We will send you our intentions via formal letter."

61.     Jerry Torres never sent a letter.

62.     Furthermore, rather than paying amounts due under the 2006 Agreement, Torres began spreading lies about Rick Ford to others in the defense contracting business, specifically telling them that Rick Ford and FedSys consistently over-billed and double and triple billed Torres AES for candidates previously hired, that Rick Ford was not trustworthy and had cheated Jerry Torres.

63.     Those individuals and entities to whom Jerry Torres made this specific allegation regarding improper billing in November of 2006, included the following: Dr. Ali, the Information Director for the Iraqi Ministry of Defense, Col. Michael Williams, members of the Iraqi Ministry of Defense, employees of Titan and executives from SOSi.

64.     During this time, Jerry Torres told all Torres AES corporate staff that they were not to contact Rick Ford, that their communications were being monitored and that anyone who corresponded with Rick Ford would be terminated immediately.

65.    In late 2006, Jerry Torres told Kelley Flodstrom, Senior Director of Development for Torres AES, that Rick Ford had refused to pay on a debt he owed to Jerry Torres when Ford owed nothing to Torres. Jerry Torres also told Kelly Flodstrom that Rick Ford cheated him, over-billed for services and was not trust worthy.

66.    In the fall of 2006, Jerry Torres instructed Torres AES corporate staff member, Bill Frogale, to draft a letter to Rick Ford which stated that the Defense Contract Audit Agency (DCAA) had found that Rick Ford and FedSys had made fraudulent claims for payment to the government. Jerry Torres also instructed Bill Frogale to fabricate invoices to Rick Ford and FedSys alleging monies owed by FedSys to Torres AES to create financial hardship and frustration to Rick Ford and FedSys.

67.    Jerry Torres intended to use these false accusations to justify Torres AES' nonpayment of obligations due under the 2006 Agreement, but Frogale refused to comply with Torres' instructions.

68.    In November 2006, Jerry Torres threatened Rick Ford stating that he would not pay him unless Rick Ford stopped advocating on behalf of a FedSys recruit, against whom Jerry Torres had filed a false incident report with Defense Security Services.

69.    Because Jerry Torres' allegations in the incident report were untrue, Rick Ford refused to stop advocating for the candidate.

70.    By phone in November 2006, Jerry Torres admitted to Rick Ford that he did not have any credible evidence to support his falsified report, but that despite the lack of evidence, he would never withdraw the report.

71. On November 29, 2006, Torres Federal Systems, Inc. filed the necessary documentation with the Florida Department of State to change its name back to FedSys, Inc., effective November 25, 2006, when Jerry Torres stated that contrary to his earlier representations, Torres AES would not subcontract work on the State Department contract to FedSys.

72. During the third week of December 2006, Rick Ford notified Jerry Torres that FedSys was terminating the 2006 Agreement due to Torres AES' failure to pay amounts due under the Agreement and Jerry Torres' failure to offer to FedSys subcontracting positions under the State Department contract and to assist in establishing FedSys as a direct subcontractor to Titan and SOSi, as promised.

73. During December 2006 and January 2007, Rick Ford spoke with Jerry Torres on several occasions with the sole purpose of securing payment from Torres AES for services rendered under the 2006 Agreement. During those conversations, Jerry Torres asked Rick Ford to reconsider working with him, but Ford refused. In January 2007, as a result of Rick Ford's refusal to reopen the working relationship and his continued advocacy for the falsely accused recruit, Jerry Torres instructed Rick Ford to sue him if he wanted to receive payment.

74. Since Rick Ford and FedSys notified Jerry Torres and Torres AES of their breach of contract, Jerry Torres and Torres AES have continued to defame Rick Ford, and his company and its officers, to other persons and entities.

### I. Breach of Contract
### 2005 Agreement
### *Torres AES*

75. Paragraphs 1-74 are included as if herein stated.

76. Under the terms of the 2005 Agreement, Torres AES was obligated to pay commissions to FedSys for candidates hired by Torres AES.

77. Upon information and belief, Torres failed to compensate FedSys for commissions due for the unknown 2005 hires.

78. FedSys has suffered damages due to Torres AES failure to pay its contractually obligated commissions.

WHEREFORE, with regard to Count I, FedSys seeks damages in an amount not less than $10,880 for commissions due by Torres AES under the 2005 Agreement for the unknown 2005 hires.

## II. Breach of Contract
## 2006 Agreement
### *Torres AES*

79. Paragraphs 1-78 are included as if herein stated.

80. Under the terms of the 2006 Agreement, Torres AES was obligated to pay commissions to FedSys for candidates referred and recruited by FedSys and hired by Torres AES.

81. Torres AES has received fees from Titan and other contractual partners for supplying candidates FedSys added to the WLSE database.

82. Torres AES either only partially paid, or refused to pay amounts due to FedSys under the 2006 Agreement for the 2006 Oracle hires and the 2006 Titan hires.

83. Torres AES' failure to pay invoices upon the payment terms laid out in the 2006 Agreement was a breach of the Agreement.

84.     Torres AES has failed or refuses to account to FedSys for the unknown 2006 candidates and has failed or refused to provide FedSys salary data for such unknown candidates.

85.     Torres AES' is obligated under the 2006 Agreement to pay FedSys commissions for the unknown 2006 candidates.

86.     FedSys has suffered damages due to Torres AES failure to pay its contractually obligated commissions.

WHEREFORE, with regard to Count II, FedSys seeks damages in an amount not less than $302,792.17 for commissions due by Torres AES under the 2006 Agreement for the 2006 Oracle hires, the 2006 Titan hires and the unknown 2006 candidates.

### III.     Quantum Meruit
### *Torres AES*

87.     Paragraphs 1-86 are included as if herein stated.

88.     When FedSys terminated the 2006 Agreement, candidates recruited by FedSys remained in the WLSE database.

89.     FedSys had incurred substantial time and resources in recruiting the candidates who were entered into the WLSE database.

90.     Torres AES blocked FedSys' access to the WLSE database, and began contacting candidates entered into the database by FedSys with the purpose of hiring them on the contracts listed in Appendix A of the 2006 Agreement.

91.     Subsequent to FedSys termination of the 2006 Agreement, Torres hired the following candidates for work on the Titan Contract: Nidal Abed Rabbo, Luma Dara, and Dirar Sammur ("the post-termination Titan hires").

92. Additionally, Torres AES hired other FedSys originated candidates listed in the WLSE database for work on other contracts with entities listed in Appendix A, including Basil Edward, Raad Ishak, and George Stephen ("other known post-termination hires.")

93. Upon information and belief, Torres AES hired other FedSys originated candidates for work on contracts with entities listed in Appendix A, who are currently unknown to FedSys ("the unknown post-termination hires.)"

94. Torres AES' placement or hiring of the post-termination Titan hires, the other known post-termination hires and the unknown post-termination hires was made possible by the recruitment and referral services provided by FedSys prior to the termination of the 2006 Agreement.

95. FedSys is entitled to payment of commissions for the post-termination Titan hires and the unknown post-termination hires based upon the payment schedule agreed to by the parties in the 2006 Agreement.

96. No payments of commissions have been made to FedSys by Torres AES in connection with the employment of the post-termination Titan hires or the unknown post-termination hires.

WHEREFORE, with regard to Count III, FedSys seeks damages in an amount not less than $65,280 representing the commissions it would have been owed under the 2006 Agreement for each of its recruits hired by Torres AES after the termination of the Agreement.

### IV. Tortious Interference with Business Expectancy
### *Jerry Torres and Torres AES*

97. Paragraphs 1-96 are included as if herein stated.

98.     After terminating the 2006 Agreement for Torres' nonpayment, in

December 2006, Rick Ford and FedSys began negotiating a subcontract with SOSi

through SOSi representative, Marvin Schroeder.

## Improper means--defamation

99.     In November 2006, Jerry Torres had communicated with senior executives

of SOSi via email and phone and told them that Rick Ford was not trustworthy. This

statement, which imputed unethical and criminal conduct to Rick Ford, was an assault on

his character and business practices, damaging his reputation personally and injuring him

in his business.

100.    This defamatory statement also damaged the reputation of FedSys in the

defense contractor industry and with the government entities which award contracts.

101.    Rick Ford is not a public official or a public figure.

102.    Jerry Torres made this statement multiple times during, prior to, and after

November 2006 with either knowledge of its falsity or lacking reasonable grounds for

belief in its truthfulness.

103.    Jerry Torres made this statement in his capacity as President and Chief

Executive Officer of Torres AES.

104.    After Rick Ford and FedSys terminated the 2006 Agreement, Jerry Torres

continued this course of conduct, seeking to defame Rick Ford personally and as he

sought to do business through FedSys.

105.    By early January of 2007, Rick Ford's negotiations with Marvin

Schroeder had matured into an oral contractual relationship, pending memorialization in a

written document, which would be imminently authenticated by the signatures of both parties.

106.    Jerry Torres was aware that Rick Ford and Marvin Schroeder were in the last stages of negotiation and the agreement was all but finalized.

107.    On or about January 16, 2007, Jerry Torres phoned Marvin Schroeder of SOSi and left the following message on Mr. Schroeder's answering machine: "We got rid of Rick Ford. Want to talk to you about it."

108.    By implication, Jerry Torres referred to his defamatory allegations against Rick Ford, which he had published via phone conversations and email to executives at SOSi--specifically that Ford, through FedSys, had cheated Jerry Torres and Torres AES by double and triple billing on contracts.

109.    Jerry Torres' phone call to Marvin Schroeder implicitly referencing his earlier defamatory statements about Rick Ford and FedSys was an intentional attempt to interfere with the nearly finalized contract between SOSi and FedSys, in order to cause SOSi to halt communications with FedSys and cancel the contract.

### Improper means—hard dealing

110.    On January 17, 2007, Jerry Torres sent an email to a SOSi executive which stated the following: "We have terminated Rick Ford's (FedSys, Inc.) services as a recruiter. He has agreements that prevent him from working with Torres customers. We would appreciate your cooperation with this."

111.    The email was untrue in that Rick Ford, not Torres AES, had terminated the 2006 Agreement in December 2006.

112. The email was also untrue with regard to the alleged existence of non-compete agreements between FedSys and Torres AES.

113. Specifically, Torres had promised that Torres AES would work to establish FedSys as a direct subcontractor to SOSi, and Ford caused FedSys to execute the name change required by Torres in reliance on that promise.

114. During January 2007, Torres AES was in a position to award subcontracts on the State Department prime contract to SOSi.

115. Additionally, SOSi and Torres AES had an understanding that Torres AES was to team with SOSi on a linguist contract, resulting in business in excess of $100 million dollars, for SOSi to support the Operation Enduring Freedom Afghanistan language program.

116. SOSi executives interpreted Torres' email request for cooperation as a threat that any award of subcontracts to SOSi was contingent upon SOSi's refusal to work with Rick Ford and FedSys.

117. Jerry Torres intended that his request for "cooperation" intimate that threat to SOSi.

118. The email sent by Torres to SOSi executives referenced a fictional noncompete agreement, implied unsatisfactory contractual performance by Rick Ford and FedSys and threatened economic retribution in the form of lost subcontracts if SOSi went through with the award of its subcontract to FedSys.

119. This conduct constitutes "hard dealing" outside of the acceptable realm of competitive behavior.

120.    Torres' defamatory accusations against FedSys and Rick Ford made to SOSi executives, as well as Torres' implicit threat in his email of January 17, 2007, caused SOSi executives to delay an award of the subcontract to FedSys until July 2007.

121.    Though FedSys was later awarded the contract, the delay caused by Torres' intentional interference with the FedSys' and SOSi's contractual relationship by use of defamation and hard dealing, resulted in damages to FedSys.

WHEREFORE, with regard to Count IV, Plaintiffs seek damages in an amount not less than $552,923.21, representing the amount of money lost by FedSys due to the delay in the award of the SOSi contract.

## V.    Virginia Computer Crimes Act
### Jerry Torres and Torres AES

122.    Paragraphs 1-121 are included as if herein stated.

123.    By entering new candidates into the WLSE database, Rick Ford and FedSys acquired the exclusive right to recruit and refer these candidates to Torres AES for placement on a contract held by Torres or one of its contractual partners listed in Appendix A of the 2006 Agreement.

124.    Any other person or entity who attempted to enter these candidates into the WLSE database would note that they were currently being recruited and that no other entity was "free to pursue" them.

125.    Thus, FedSys had a proprietary interest in those candidate names it entered into the WLSE database.

126.    When Torres AES breached the 2006 Agreement and FedSys terminated its relationship with Torres AES, FedSys retained its proprietary interest in the candidates it had entered into the WLSE database.

127. Jerry Torres and Torres AES, however, blocked FedSys' access to its own candidates using the WLSE database.

128. Neither Jerry Torres, nor Torres AES were "free to pursue" these candidates entered into the database by FedSys.

129. Jerry Torres and Torres AES lacked the authority to contact and recruit the candidates entered into the database by FedSys.

130. Nonetheless, Torres AES intentionally contacted FedSys candidates with the purpose of hiring them to work on contracts held by Torres AES or other contractual partners listed in Appendix A.

131. Torres AES actually did hire the post-termination Titan hires, the other post-termination hires, and other unknown hires to work on contracts held by Torres AES or entities listed in Appendix A.

132. The value of these candidates to FedSys calculated on the commissions due under the 2006 Agreement exceeds $200.

WHEREFORE, with regard to Count V, FedSys seeks damages in an amount not less than $65,280. Additionally, FedSys asks this court to order the defendants to pay the costs incurred by Plaintiffs in bringing this claim, as permitted under Virginia Code § 18.2-152.12(a).

## VI. Violation of the Computer Fraud and Abuse Act, 18 USC 1030
### *Jerry Torres and Torres AES*

133. Paragraphs 1-131 are included as if herein stated.

134. The WLSE database stores candidates' data for potential placement on government contracts.

135. The database serves the interest in the U.S. government by providing resources which support the operations of the department of defense and other government agencies in furtherance of national defense and national security.

136. The database affects interstate commerce or communication by acting as a resource for government contractors seeking individuals with particular skill sets to perform on government contracts.

137. Knowingly and with intent to defraud, Jerry Torres and Torres AES accessed the records of FedSys in the WLSE database without authorization, to obtain the personal information of candidates whom Torres AES was "not free to pursue."

138. The names of the candidates entered into the WLSE database by FedSys were valuable as a source of income to FedSys.

WHEREFORE, with regard to Count VI, FedSys seeks damages in an amount not less than $65,280. Additionally, FedSys asks this court to enjoin defendants from any further use of the WLSE database to contact candidates entered by FedSys.

## VI. Violation Virginia Uniform Trade Secrets Act
### *Jerry Torres and Torres AES*

139. Paragraphs 1-138 are included as if herein stated.

140. The list of recruits entered into the WLSE database by FedSys was a potential source of income for FedSys.

141. The value of that list to FedSys was derived from the fact that FedSys had a proprietary interest in each of its candidates entered into the database, and other recruiters were "not free to pursue" them.

142.  Disclosure and abandonment of the list of candidates and their contact information to other recruiters would allow other recruiters to derive economic benefit from FedSys' list of recruits.

143.  FedSys did not abandon or consent to disclosure of its candidate list.

144.  FedSys list of recruits added to the WLSE database constitutes a trade secret under Virginia Code § 59.1-336.

145.  As a co-user of the WLSE database, Jerry Torres and Torres AES had a duty to maintain the secrecy of FedSys' list and utilize FedSys recruits only under the terms of the 2006 Agreement.

146.  Termination of the 2006 Agreement did not terminate FedSys' proprietary interest in its own recruit list.

147.  With full knowledge of the fact of FedSys' proprietary interest in its list and of the economic value to FedSys of maintaining secrecy and limiting access to that list, Jerry Torres and Torres AES accessed and used FedSys' recruit list entered without authorization from FedSys.

148.  In addition, in April 2006 Jerry Torres and Torres AES provided FedSys' list, including the candidates' personal information, to a Canadian telemarketing firm as a component of a list of over 14,000 candidate names which Jerry Torres and Torres AES obtained in error from L3 Titan.

149.  Such misappropriation was willful and malicious and undertaken in bad faith with intent to harm FedSys and bring economic advantage to Torres AES.

WHEREFORE, with regard to Count VI, Plaintiffs, FedSys and Rick Ford seek damages for the misappropriation of the recruit list including the actual value of such list,

calculated by the income the individuals on the list would have generated for FedSys under the 2006 Agreement, and the amount by which Torres AES was unjustly enriched by his use of the list. Virginia Code § 59.1-338. Additionally, Plaintiffs seek compensation for the amount of attorneys fees incurred in bringing this claim as permitted by Virginia Code § 59.1-338.1. Finally, Plaintiffs seek double damages or $350,000 due to the willful and malicious misappropriation of their recruit list as permitted by Virginia Code § 59.1-338(A).

## VII. Defamation per se
### *Jerry Torres and Torres AES*

150. Paragraphs 1-149 are included as if herein stated.

151. On or about February 6, 2007, Crystal Kerns, Facility Security Officer for Torres AES, filed a false incident report with Defense Security Services ("DISCO") against Rick Ford and FedSys at the instruction of Jerry Torres.

152. Knowing Torres' propensity for character defamation, Rick Ford would periodically check his security clearance.

153. In early July 2007, Rick Ford checked his security clearance and noticed that he had a "red flag" which stated "pending incident report."

154. On July 9, 2007, Rick Ford sent a certified letter to the DISCO requesting a copy of the incident report, but was told that the report would not be released pending an investigation of the allegations in the report.

155. At the same time, Rick Ford made a request by phone to the Torres Facility Security Officer at the time for a copy of the incident report, but Torres informed him that Torres AES did not have a copy.

156.    Rick Ford then contacted its security representative regarding how to find out the contents of the incident report, but was told that no specific information would be released until a formal investigation was completed.

157.    While the investigation was pending, Rick Ford's and FedSys' security clearance was negatively affected, as anyone doing a clearance check would be able to see that a report had been filed with DISCO against Rick Ford and FedSys.

158.    FedSys' business growth was impeded by the pendency of the incident report as FedSys could not apply for additional security clearances while their current clearance was negatively implicated.

159.    Specifically, FedSys held off getting a facility clearance at the National Security Agency until the investigation was resolved.

160.    Without the facility clearance, FedSys was unable to operate as a prime contractor for the National Security Agency.

161.    In the spring of 2008, a DISCO investigator interviewed Rick Ford in connection with the investigation.   It was during this interview that Rick Ford first became aware of the contents of the incident report.

162.    The report alleged among other things that Ford and FedSys overbilled Torres AES, that FedSys was financially unsound, and that Ford and FedSys had failed to pay monies owed to Torres AES.

163.    These allegations, which imputed unethical and criminal conduct to Rick Ford, were an assault on his character and business practices, damaging his reputation personally, and injuring him in his business.

164. Rick Ford has been damaged personally in that the report is now a part of his permanent record.

165. This defamatory statement also damaged the reputation of FedSys in the defense contractor industry and with the government entities which award contracts.

166. Jerry Torres made these allegations with knowledge of their falsity and with actual malice.

167. Jerry Torres made this statement in his capacity as President and Chief Executive Officer of Torres AES.

168. On May 29, 2008, DISCO made a final determination on the incident report, deciding that the allegations against Ford and FedSys had no merit.

169. Notwithstanding DISCO's determination, Jerry Torres has continued, up to and including in the month of April 2008, to republish these false allegations against Rick Ford and FedSys to others, including Kelly Flodstrom.

WHEREFORE, with regard to Count VII, Plaintiffs ask this Honorable Court to order retraction of the false incident report and request damages, in an amount to be determined at trial, together with punitive damages based on the existence of actual malice.

## Jury Demand

Pursuant to FRCP 38(b), Plaintiffs demand a trial by jury of all issues triable by right by a jury.

WHEREFORE, Plaintiffs pray that this Honorable Court enter judgment for them on Counts 1-VII of this Complaint, in the amounts and manner requested in each ad damnum clause herein appearing, and prays also for such further relief as to this Court seems proper and just.

Respectfully submitted,
**RICHARD FORD and**
**FEDSYS, INC.**
By counsel

By: _____
James K. Lay, Esq.
VSB Bar No. 44923
Attorney for Rick Ford and FedSys, Inc.
Lay, Moore & Poretz, PLLC
303 N. Washington St.
Alexandria, VA 22314
Tel: 703-299-1040
Fax: 703-299-1039
jim@laymoore.com