IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

RICHARD J. FORD et al.,          )
                                 )
     Plaintiffs,                 )
                                 )
                                 )
          v.                     )     1:08cv1153 (JCC)
                                 )
                                 )
JERRY W. TORRES et al.,          )
                                 )
     Defendants.                 )

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendants Jerry Torres and Torres Advanced Enterprise Solutions, LLC's Motion to Dismiss.  For the following reasons, the Court will grant in part and deny in part Defendants' Motion.

### I. Background

Plaintiffs Richard J. Ford ("Ford") and FedSys, Inc. ("FedSys") (collectively, "Plaintiffs") brought this action against Defendants Jerry W. Torres ("Torres") and Torres Advanced Enterprise Solutions, LLC ("TAES") (collectively, "Defendants") after the business relationship between the parties failed. Torres is the CEO, President, and owner of TAES, and Ford is a part-owner of FedSys.  Defs.' Mem. in Supp. at 3.  Plaintiffs

filed their federal complaint (the "Complaint") on November 4, 2008.[1]  The allegations in the Complaint are as follows.

FedSys provides linguistic services, including translation, interpretation, and intelligence services, to the United States government (the "Government"), the Department of Defense (the "DoD"), and contractors and subcontractors to the Government and the DoD.  Compl. at ¶ 8.  In August 2005, FedSys entered into a contract with TAES (the "2005 Agreement") under which FedSys agreed to recruit qualified linguistic services candidates for TAES.  *Id.* at ¶ 10.

Pursuant to the 2005 Agreement, FedSys provided support services to the recruited candidates by, among other things, coordinating background checks, scheduling language tests and medical screenings, and helping to complete paperwork.  *Id.* at ¶ 15.  TAES agreed to compensate FedSys for these services by paying FedSys a commission for each qualified candidate referred to it.  Commissions were set at a percentage of each candidate's first- and second-year salaries.  *Id.* at ¶ 16.  With the knowledge of FedSys, TAES hired certain FedSys-recruited candidates under the 2005 Agreement.  TAES also hired other candidates that FedSys referred to it, but it did not disclose to FedSys the candidates' identities or the fact that they were

---

[1] According to Defendants, Plaintiffs sued them in April 2007 in the Circuit Court of Arlington County, Virginia, bringing claims arising out of the same facts and circumstances giving rise to this case.  Plaintiffs took a non-suit in the state action.  Defs.' Mem. in Supp. at 2; Ex. 1.

hired.  *Id*. at ¶¶ 24-25.  Around September 13, 2006, Torres sent Ford an e-mail indicating his intent to terminate the 2005 Agreement and enter into a new agreement with different payment terms.  *Id.* at ¶¶ 26.

During and after the time that the 2005 Agreement was in effect, Torres told Ford that if FedSys formed a "strategic relationship" with TAES, FedSys would receive 49% of the business that it helped TAES obtain.  *Id.* at ¶ 18.  Torres also agreed to help FedSys become a direct subcontractor on the prime contracts maintained by TAES or on prime contracts administered by other corporations for which TAES was a subcontractor.  *Id.* at ¶¶ 18-20.

FedSys did form a "strategic relationship" with TAES and fulfilled its obligation to bring in new business, but TAES did not help FedSys become a direct subcontractor on its prime contracts.  *Id.* at ¶¶ 21-22.  Instead, Torres spread false information about FedSys and Ford in an attempt to discredit them and prevent other companies from working with them.  Torres also misled Plaintiffs about the requirements that Plaintiffs would need to meet to fulfill their end of the "strategic relationship."  *Id.* at ¶¶ 33-34.  Torres incorrectly told Plaintiffs that to become a subcontractor to the State Department or to SOSi International, Ltd. ("SOSi"), a government contractor, FedSys would need to change its name to Torres Federal Systems,

3

Inc.  Ford went through with the name change, which became
effective on October 1, 2006; after the parties' relationship
disintegrated, Ford changed the name of the FedSys entity back to
FedSys.[2]  *Id.* at ¶¶ 35-37.  Even after the name change, Torres
did not follow through with his end of the bargain.  *Id.* at ¶ 38.

In October 2006, TAES and FedSys entered a second
agreement (the "2006 Agreement"), under which FedSys again agreed
to refer qualified linguistic personnel to TAES in return for
commission fees, this time under a different fee structure.  *See
id.* at ¶¶ 39-48.  Under the 2006 Agreement, FedSys used a data
entry system, called the Worldwide Linguist Services Environment
database (the "WLSE"), to enter the names of each new candidate
it recruited.  The WLSE kept track of whether linguistic services
candidates had already been recruited by another company.  The
WLSE denominated candidates already entered into the database by
another recruiter as "not free to pursue."  Candidates not
previously entered into the WLSE were labeled "free to pursue."
*Id.* at ¶¶ 50-52.

Pursuant to the 2006 Agreement, TAES hired several
FedSys-recruited candidates to work on one of its government
contracts.  TAES also assigned an unknown number of FedSys-
recruited candidates to work on its own contracts or those of its

---

[2] For part of the time period described in the Complaint, FedSys was
known as Torres Federal Systems, Inc.  For the sake of clarity, the plaintiff
entity will be referred to throughout as "FedSys."  The corporation's name was
changed back to FedSys on November 29, 2006.

partners, but did not disclose these hires to FedSys. *Id.* at ¶¶ 55-56.

FedSys provided TAES with an invoice for commission payments due under the 2006 Agreement. TAES did not pay FedSys. *Id.* at ¶ 58. FedSys made repeated requests for payment and information from TAES. *Id.* at ¶ 59. In January 2007, Torres told Ford to work exclusively through him to handle the payment issue. *Id.* at ¶ 60. Instead of paying FedSys, however, Torres spread untrue rumors about FedSys and Ford to other individuals in the defense contracting business, including statements that Plaintiffs double- and triple-billed TAES for referred candidates. *Id.* at ¶ 63. Torres also stated that Ford had cheated him. *Id.*

Torres took a number of other actions against Ford and FedSys. In April 2006, he and TAES provided FedSys's list of recruits to a Canadian telemarketing firm. *Id.* at ¶ 148. Torres told Kelley Flodstrom, a TAES executive, that Ford had refused to pay a debt he owed Torres – when no such debt existed. He also told Flodstrom that Ford had cheated him, had over-billed, and was not trustworthy. *Id.* at ¶ 65. Additionally, Torres told a TAES corporate staff member to draft a letter to Ford stating that the Defense Contract Audit Agency had found that Ford and FedSys had made fraudulent claims on the Government; Torres told the same staff member to fabricate invoices stating that FedSys

owed TAES money.  The corporate staff member refused to take either action.  *Id.* at ¶ 66-67.  Finally, after he filed a false incident report against a FedSys recruit that contained untrue allegations, Torres said that he would not pay Ford unless Ford stopped advocating for the FedSys recruit.  Torres later admitted that he did not have credible evidence to support his false incident report.  *Id.* at ¶¶ 68-70.  In late December 2006, Ford, acting on behalf of FedSys, terminated the 2006 Agreement.  *Id.* at ¶ 72.

Plaintiffs bring the following claims in their Complaint: Count I: breach of the 2005 Agreement; Count II: breach of the 2006 Agreement; Count III: *quantum meruit*, against TAES; Count IV: tortious interference with business expectancy, against Defendants; Count V: violation of the Virginia Computer Crimes Act, against Defendants; Count VI: violation of the federal Computer Fraud and Abuse Act, against Defendants; Count VII: violation of the Virginia Uniform Trade Secrets Act, against Defendants; and Count VIII: defamation, against Defendants.

Defendants moved to dismiss the Complaint on November 28, 2008.  Plaintiffs responded on December 9, and Defendants filed a reply on December 15.  Defendants' Motion is before the Court.

## II.   Standard of Review

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint, *see Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994) (citation omitted).  In deciding a motion to dismiss, "the material allegations of the complaint are taken as admitted." *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citation omitted).  Moreover, "the complaint is to be liberally construed in favor of plaintiff." *Id.*  A motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8.  While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964-65 (2007) (citation omitted).

## III. Analysis

Defendants argue that Plaintiffs failed to state a claim for Counts III through VIII - for all causes of action except the breach of contract claims.  Defendants further suggest that, if the Court dismisses Counts III through VIII, which includes the federal claim (Count VI), the remaining breach of contract claims - Counts I-II - should be dismissed or remanded back to the Circuit Court of Arlington County, Virginia.  The

Court will address the arguments for dismissing each claim in turn.

    A. <u>Count III</u>: <u>*Quantum Meruit*</u>

        Plaintiffs allege that, after the termination of the 2006 Agreement, the candidates it had previously recruited for TAES remained in the WLSE database.  Some were later contacted and hired by TAES, which did not pay FedSys a commission for these candidates.  *See* Compl. at ¶¶ 87-94.  Plaintiffs assert, under a *quantum meruit* theory, that they are entitled to commissions for the candidates they recruited that TAES hired after the termination of the 2006 Agreement.  *Id.* at ¶¶ 95-96.

        A *quantum meruit* claim under Virginia law has three elements: (1) a benefit conferred on the defendant by the plaintiff; (2) the defendant's knowledge that the benefit was conferred; and (3) acceptance or retention of the benefit in circumstances that would make it inequitable for the defendant to keep the benefit without paying for it.  *Centex Constr. v. Acstar Ins. Co.*, 448 F. Supp. 2d 697, 707 (E.D. Va. 2006).

        Defendants argue that the *quantum meruit* claim must fail as a matter of law because Virginia law does not allow recovery in *quantum meruit* when an express contract governs the rights and obligations of the parties.  Defs.' Mem. in Supp. at 7-8.

Generally, *quantum meruit* relief is not available if a contract "expressly delineate[s] the contractual obligations . . . on the subject in question." *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489, 491 (4th Cir. 1992); *see In re Stevenson Assoc.*, 777 F.2d 415, 421-22 (8th Cir. 1985) (citations omitted) ("[T]here can be no recovery in quantum meruit where a valid express contract between the parties exists. Parties to an express contract are entitled to have their rights and duties adjudicated exclusively by its terms."). Where the parties remained in a contractual relationship at all relevant times, *quantum meruit* is unavailable. *Centrex Constr.*, 448 F. Supp. 2d at 708. Defendants claim that Plaintiffs' pleadings show that Plaintiffs did not perform any work after terminating the 2006 Agreement. Thus, they argue, the compensation Plaintiffs seek in *quantum meruit* was earned, if at all, pursuant to the 2006 Agreement. Defs.' Mem. in Supp. at 7-8.

Plaintiffs contend that there was no contract in effect at the time that TAES hired the personnel that FedSys had recruited prior to terminating the 2006 Agreement. Because no contractual relationship governed the parties at the time that TAES received the benefit of FedSys's work, Plaintiffs claim that recovery should be allowed under an unjust enrichment theory.

The Court will allow Plaintiffs to press their *quantum meruit* claim as an alternative ground for relief for conduct that

may have occurred outside the coverage of the contracts.  Both federal and Virginia law allow parties to press alternative legal theories.  *See* Fed. R. Civ. P. 8(d); *Kincheloe v. Spotsylvania County*, 13 Va. Cir. 133, 1988 WL 619128, at *1 (Va. Cir., Feb. 22, 1988); *see also Mikels v. Unique Tool & Mfg. Co.*, 2007 WL 4284727, at *9 (W.D.N.C., Dec. 3, 2007).  If the 2006 Agreement governs the post-termination hires, then the equitable remedy of *quantum meruit* will not lie.  Even though Plaintiffs will not be able to recover under both contract and quasi-contract doctrines for these hires, however, they are not barred from pleading alternative theories of recovery "where the existence of a contract concerning the subject matter is in dispute."  *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792-93 (D. Md. 2002); *see also Va. Elec. & Power Co. v. Broe Growth Capital LLC*, 2007 WL 2071726, at *2 (E.D. Va., July 27, 2007) (citation omitted) ("Virginia law prohibits simultaneous recovery through both equitable and legal remedies. If a full remedy at law is available, then one based on equitable principles is barred.").

From the face of the 2006 Agreement, it does not appear that either party considered what the status of un-hired recruits would be at the time of termination.  In this situation, where the "benefit" from FedSys was arguably available while the contract was in force, but TAES did not accept the benefit until

after FedSys terminated the contract, "contractual
obligations . . . on the subject in question" may not have been
in place.  *Raymond, Colesar, Glaspy & Huss, P.C.*, 961 F.2d at
491.  It is possible that no contract governs the post-
termination hires.  *See Appleton v. Bondurant & Appleton, P.C.*,
67 Va. Cir. 95, 2005 WL 517491, at *7 (Va. Cir., Feb. 28, 2005)
(holding that a *quantum meruit* claim may be viable when no
agreement covered post-departure compensation for work previously
performed); *see also Mikels v. Unique Tool & Mfg. Co.*, 2007 WL
4284727, at *10 (W.D. N.C., Dec. 3, 2007) (explaining a similar
finding under North Carolina law).  At this time, it would be
premature to rule that the 2006 Agreement clearly governs the
status of these personnel.

        If no contract governs the post-termination hires, then
*quantum meruit* may apply.  If, of course, the 2006 Agreement does
cover the events complained of in Count III, then an equitable,
quasi-contract remedy will not be available.  At the pleading
stage, however, the Court finds that Plaintiffs have stated a
plausible alternative theory of relief.

   B. Count IV: Tortious Interference with Business Expectancy
        Plaintiffs allege that Defendants tortiously interfered
with a subcontract that Ford was negotiating with SOSi, a
government contractor.  During the time of the alleged tortious
interference, TAES was in a position to award subcontracts on a

11

State Department contract to SOSi, which gave TAES influence and leverage over the company. *See* Compl. at ¶¶ 110-11, 114-19. Plaintiffs claim that Jerry Torres used improper means – namely, defamation and "hard dealing" – to interfere with the contractual relationship between FedSys and SOSi. SOSi ultimately awarded FedSys a subcontract, but not until after a significant delay allegedly caused by Defendants' actions. Plaintiffs claim that the delay cost them more than $500,000. *Id.* at ¶¶ 120-21.

> (1) demonstrate the existence of a business relationship or expectancy, with a probability of future economic benefit; (2) prove knowledge of the relationship or expectancy; (3) show that it was reasonably certain that absent intentional misconduct, the claimant would have continued in the relationship or realized the expectancy; and (4) show that it suffered damages from the interference.

*Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 709 (E.D. Va. 2003) (citing *Commerce Funding Corp. v. Worldwide Sec. Serv. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001); *see also Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985). In addition, when the damage occurs to a contract terminable at will or to *prospective* economic advantage, the plaintiff must allege that the interfering party used "improper methods." *Masco Contractor Servs. E., Inc.*, 279 F. Supp. 2d at 709; *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987). Improper methods may include the violation of a trade standard, sharp dealing, overreaching, or

unfair competition.  *Simbeck, Inc. v. Dodd-Sisk Whitlock Corp.*, 44 Va. Cir. 54, 1997 WL 1070458, at *6 (Va. Cir. Ct. Nov. 21, 1997) (citations omitted); *see also Commerce Funding Corp.*, 249 F.3d at 214 (citing *Duggin*, 360 S.E.2d at 836-37).

Defendants raise two arguments for dismissal.  First, they claim that Plaintiffs cannot plead tortious interference when they were ultimately awarded the subcontract.  Second, they claim that Plaintiffs do not sufficiently allege "improper means."

Defendants' first argument – that there was no actual termination of the business expectancy because FedSys ultimately won the SOSi contract – will not support dismissal of the claim at this time.  Defendant has not demonstrated that the only actionable termination of relations between the parties is a permanent one.  Plaintiffs have alleged that Torres's actions and statements led SOSi to significantly delay the otherwise imminent award of a subcontract to FedSys.  Construing the Complaint liberally in favor of Plaintiffs, the Court will not rule out the possibility that having the contract with SOSi immediately rather than at some unknown point in the future constituted an economic advantage that was terminated by Defendants' actions.  In other words, the relevant business expectancy may have been that FedSys and SOSi would immediately enter into a contractor-subcontractor relationship.  That FedSys and SOSi subsequently patched up their

agreement does not necessarily undo the damage allegedly caused by Torres's interference with their negotiations.

One unpublished Fourth Circuit case presents somewhat similar facts; it does not hold that a significant delay could *never* constitute an actionable break in the relevant business relationship or a non-realization of the business expectancy. *See Southprint, Inc. v. H3, Inc.*, 208 Fed. Appx. 249, 2006 WL 3522458 (4th Cir., Dec. 7 2006). In *Southprint*, two companies were bidding on a contract for a prospective customer. The customer tentatively indicated that the plaintiff would win the contract. The defendant allegedly interfered by questioning plaintiff's ability to fulfill the contract, and the customer asked the two companies to re-bid the contract. *Id.* at 251, *2. After the re-bidding process – which started and ended less than a month after the tentative acceptance – the customer ultimately awarded the contract to the plaintiff. *Id.* at 254, *4. The Fourth Circuit explained that the customer's request for a second bid did not destroy the plaintiff's business expectancy in a way that would allow it to sue for tortious interference. *Id.*

In *Southprint*, the relevant "delay" was short, the bidding process was ongoing, and the customer's acceptance of the bid was only tentative. Here, by contrast, the "delay" was lengthy and costly, and, crucially, the negotiations between Plaintiffs and SOSi "had matured into an oral contractual

14

relationship"; the only remaining step was memorialization in a formal contract.  Compl. at ¶ 105.  Absent case law to the contrary, it is plausible that Torres's alleged actions caused an actionable breach or termination of the business expectancy.  At this stage of the litigation, Plaintiff has not demonstrated that the subsequent repair to the breach negates any damages suffered in the interim.

Defendants' second argument – that Plaintiffs did not properly plead defamation or sharp dealing as an "improper method" – also falls short.  Plaintiffs allege that, while FedSys and SOSi were on the verge of signing their contract, Torres e-mailed a SOSi executive with the following message: "We have terminated Rick Ford's (FedSys, Inc.) services as a recruiter. He has agreements that prevent him from working with [TAES] customers.  We would appreciate your cooperation with this." Compl. at ¶ 110.  At the time Torres sent the e-mail, TAES was in a position to award subcontracts to SOSi.  *Id.* at ¶ 114. Additionally, SOSi and TAES were planning to work together on a $100 million linguist contract in support of Operation Enduring Freedom in Afghanistan.  *Id.* at ¶ 115.  The Complaint alleges that SOSi executives interpreted Torres's e-mail as a threat that future subcontracts were contingent on SOSi's refusal to work with Plaintiffs and that Torres intended for his e-mail to serve

as a threat.  *Id.* at ¶ 116-17.  This, Plaintiffs claim, constitutes the "improper means" of "sharp dealing."

Defendants argue that the statements in the e-mail were true because a non-compete agreement did exist between the parties.  Sending an e-mail containing true statements, Defendants state, "does not reach the level of anti-competitive or unfair conduct that tortious interference is meant to protect."  Defs.' Mem. in Supp. at 12.  The problem with this argument is that Defendants have not shown a non-competition agreement in place at the time Torres wrote his e-mail to the SOSi executive.  The non-competition clause in the 2006 Agreement states the following:

> [FedSys] agrees not to work with, support, contract with or provide candidates to any other firm . . . or entity directly or indirectly . . . under this agreement, under any condition without the advanced written approval of the [TAES] designated authority *during this agreement's period of performance*.

Compl. Ex. 2 at ¶ 6.0 (emphasis added).  FedSys terminated the 2006 Agreement in late December 2006.  Compl. at ¶ 72.  Torres allegedly sent the e-mail claiming that "[Ford] has agreements that prevent him from working with Torres customers" on January 17, 2007.  *Id.* at ¶ 110.  At this stage of the litigation, the Court will accept as true Plaintiffs' allegations that the e-mail was intended to, and did, intimidate SOSi into at least temporarily refusing to sign the subcontract agreement with FedSys.  Plaintiffs have sufficiently alleged "improper means."

16

Their claim for tortious interference will survive the motion to dismiss.

    C. <u>Count V: Virginia Computer Crimes Act</u>

       Plaintiffs bring Counts V-VII, all statutory tort claims, as alternative causes of action to the *quantum meruit* claim.  Defendants raise the same general defense to these causes of action that they raised against the *quantum meruit* claim: Plaintiffs, they argue, cannot bring a separate tort claim based on allegations sounding in contract.  The Court will not dismiss Counts V-VII based on this theory for the same reasons that it will allow the *quantum meruit* claim to survive the 12(b)(6) motion.  *See supra* subpart III.A.  Instead, the Court will evaluate the merits of Defendants' arguments as to why each individual count should be dismissed.

       Count V of the Complaint alleges that Defendants violated the Virginia Computer Crimes Act (the "VCCA") when they wrongfully blocked FedSys's access to the WLSE (the linguist recruitment database) and wrongfully used the WLSE to hire FedSys recruits that Defendants were not "free to pursue."  FedSys claims that Defendants were not "free to pursue" the candidates because FedSys retained a proprietary interest in the candidate names it entered into the WLSE.  Compl. at ¶¶ 123-32.

       To show a violation of the VCCA, a plaintiff must demonstrate that the defendant: (1) used a computer or computer

network without authority (2) with the intent to obtain property or services by false pretenses, embezzle or commit larceny, or convert the property of another.  Va. Code Ann. § 18.2-152.3; *id.* at § 18.2-152.12; *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008); *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 230 (4th Cir. 1993).

Taking all facts in the Complaint as true and construing them in favor of Plaintiffs, the Court finds that Plaintiffs have pled a violation of the VCCA.  The Complaint alleges that Plaintiffs had a proprietary right in the names it entered onto the WLSE database.  It states that Defendants improperly used the information that Plaintiffs entered onto the database to contact and hire Plaintiff's linguistic recruits. Compl. at ¶ 129-30.  The Complaint also asserts that Defendants blocked FedSys's access to its own candidates.  *Id.* at ¶ 127. These allegations are sufficient to state the elements of the claim: Defendants used a computer "without authority," that is, "know[ing] that [they had] no right or permission or knowingly act[ing] in a manner exceeding such right or permission."  Va. Code Ann. § 18.2-152.2.  The facts pled in the Complaint are also sufficient, at this stage, to plead the second prong: that Defendants used the computer to wrongfully appropriate Plaintiffs' property.

Defendants raise a defense to Plaintiffs' claim based on the actual ownership of the WLSE database.  They assert that Plaintiffs, as subcontractors to TAES, could only access the WLSE database through TAES's own right of access, which TAES secured through a contract with a third party (L-3 Communications).  When Plaintiffs terminated the 2006 Agreement, Defendants contend, they lost their right to access the WLSE database.

If Defendants are correct that all parties' rights to the database were governed by a separate contract between Defendants and a third party, it may be difficult for FedSys to prove that it maintained rights in the information on the database after the termination of its agreement with TAES. Defendants' arguments, however, are based on facts and documents outside the allegations of the Complaint – viz., the contract between TAES and L-3.  At this time, the Court will not find the TAES/L-3 Contract "integral" to the Complaint in a way that would allow it to consider the contract at the motion to dismiss stage. The TAES/L-3 Contract was not discussed explicitly or relied upon in the Complaint.  *See Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006).

D. Count VI: Computer Fraud and Abuse Act

In Count VI, Plaintiffs allege that Defendants violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA"). The CFAA provides a cause of action against an individual who,

among other actionable violations, "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C).  Plaintiffs do not specify which section of the CFAA Defendants violated.

Generally, a civil claim under the statute must show that the defendant party accessed a computer or computer network either without authorization or in excess of authorized access. *See* 18 U.S.C. § 1030(a)(1)-(2); *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 608 (E.D. Va. 2005).  Additionally, the statute limits civil claims that may be brought for damage or loss due to a CFAA violation to those in which the conduct involves one of the following factors:

> (I) loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value; (II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals; (III) physical injury to any person; (IV) a threat to public health or safety; (V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security.

18 U.S.C. §§ 1030(g), 1030(c)(4)(A)(i)(I)-(V); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004).  Defendants argue that Plaintiffs have failed to allege that the conduct of Torres or TAES involves any of the five statutory factors.

Plaintiffs claim to have properly pled the fifth factor, "damage affecting a computer used by or for an entity of

the United States Government."  Pl.'s Mem. in Opp'n at 12 (citing Compl. at ¶ 135 ("The database serves the interest in the U.S. government by providing resources which support the operations of the department of defense . . .")).  The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8). Paragraph 135 of the Complaint may allege that the WLSE database is a "computer used . . . for an entity of the United States Government in furtherance of the administration of . . . national defense," but it has nothing to say about what "damage" occurred.

Later in the section of the Complaint describing the CFAA cause of action, Plaintiffs claim that Defendants "accessed the records of FedSys in the WLSE database without authorization."  Compl. at ¶ 137.  While this allegation may be actionable under some other theory, it also does not suffice to state a claim that Defendants "impair[ed] . . . the integrity or availability" of the WLSE.  18 U.S.C. § 1030(e)(8).  In an earlier part of the Complaint incorporated into the CFAA section, however, Plaintiffs claimed that Defendants "blocked FedSys' access to its own candidates using the WLSE database."  Compl. at ¶ 127.  At this stage of the litigation, that allegation is sufficient to state the fifth statutory factor: Defendants "damage[d]" the WLSE by "impair[ing] . . . the availability of data" to a party entitled to the data.  18 U.S.C. § 1030(e)(8).

Given a liberal construction, ¶ 127 states that Defendants did *something* to the WLSE database to improperly limit the availability of the information it contained.  This is enough to allege "damage" under the very broad definition the CFAA gives to that term.

The Court notes Defendants' contention that, under the contract governing the use of the WLSE, it did nothing improper in purportedly blocking Plaintiffs' access to the database. Defs.' Mot. to Dismiss at 15.  If Defendants can prove this defense, Plaintiffs must be able to demonstrate some cause of "damage" under the CFAA that does not rely on ¶ 127.  As noted above, however, any argument based on an outside contract not integral to the Complaint must wait until a later stage of the litigation.  For this reason, the Court will not dismiss Count VI.

E. <u>Count VII: Virginia Uniform Trade Secrets Act</u>

To establish a claim for breach of the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code Ann. §§ 59.1-336 to -343, a plaintiff must prove that (1) the information in question constitutes a trade secret; and (2) that it was misappropriated. *MicroStrategy, Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004).  To constitute a trade secret, "information must be of a subject matter entitled to trade secret protection, must have independent economic value as a result of

22

not being generally known and not being readily ascertainable by proper means; and reasonable efforts must have been taken to maintain its secrecy." *Id.* Many classes of information can constitute a trade secret, including customer lists and sales techniques. *Id.* (citation omitted). As to the second prong, VUTSA defines "misappropriation" as the:

> 1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or  2. Disclosure or use of a trade secret of another without express or implied consent by a person who (a) Used improper means to acquire knowledge of the trade secret; or (b) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (1) Derived from or through a person who had utilized improper means to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limits its use; or (4) Acquired by accident or mistake.

Va. Code Ann. § 59.1-336; *see MicroStrategy, Inc.*, 331 F. Supp. 2d at 416.

Like their defense to the VCCA claim, Defendants' argument against the existence of a trade secret depends largely on the contractual right of access to the WLSE database that Defendants possessed under their agreements with a third party. The Complaint, however, alleges that Plaintiffs had a proprietary interest in the list of recruits that they entered onto the WLSE database.  Plaintiffs also claim that TAES had a duty to maintain the secrecy of the list.  Compl. at ¶¶ 145-46.

At this stage of the litigation, these allegations are sufficient for Plaintiffs' trade secret claim to survive. Plaintiffs have alleged: (1) possession of a proprietary list of information capable of being protected as a trade secret, (2) which had economic value because other linguistic recruiters were not "free to pursue" them, and (3) that TAES, as a co-user of the WLSE database, had a duty to maintain the secrecy of the list but instead used the list to its own advantage.

Thus, the facts pled in the Complaint, construed in favor of Plaintiffs, show the existence of a trade secret and its "misappropriation" – which occurred here because the list was purportedly "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  Va. Code Ann. § 59.1-336.  Rather than "maintain its secrecy or limit its use," Plaintiffs claim, Defendants improperly used the information to hire FedSys-recruited linguists without the knowledge of FedSys.

While Defendants may ultimately have a successful defense to the claim that Plaintiffs' information constitutes a "trade secret," based on the limitations to Plaintiffs' rights in the information entered into the WLSE database, see Pl.'s Mem. in Supp. at 17, that defense depends on information outside the Complaint and is more appropriate for a summary judgment motion. The Court will not dismiss Count VII at this time.

24

F. Count VIII: Defamation

Plaintiffs assert their final claim, for defamation per se, against both Torres and TAES.  At common law, certain defamatory words are actionable per se:

> (1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished.    (2) Those which impute that a person is infected with some contagious disease . . . . (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit . . . . (4) Those which prejudice such person in his or her profession or trade.

*Tronfeld v. Nationwide Mut. Ins. Co.*, 636 S.E.2d 447, 449-50 (Va. 2006) (citing *Fleming v. Moore*, 275 S.E.2d 632, 635 (Va. 1981)).

The Complaint alleges that Torres instructed a TAES Facility Security Officer to file a false incident report against Ford with the Defense Security Services, a DoD agency.  Compl. at ¶ 151.  The incident report negatively affected Plaintiffs' security clearances and impeded the growth of FedSys, which was delayed in receiving a facility clearance at the National Security Agency until the Defense Security Services completed its investigation.  The delay prevented FedSys from operating as a prime contractor for the National Security Agency.  *Id.* at ¶¶ 157-60.

The false incident report contained allegations that Plaintiffs over-billed TAES, that FedSys was financially unsound, and that Plaintiffs had not paid money that they owed to TAES.

Compl. at ¶ 162.  After an investigation, Defense Security
Services determined that the allegations had no merit.  *Id*. at
¶ 168.

Statements made about Ford's business integrity could
plausibly constitute defamation per se, because they would
"prejudice such person in his or her profession or trade."
*Tronfeld*, 636 S.E.2d at 450.  Defendants, though, claim that any
statements they made are absolutely privileged because they were
required communications made to a government agency.  Defs.' Mem.
in Supp. at 20-22.

Citing *Becker v. Philco*, 372 F.2d 771 (4th Cir. 1967),
Defendants claim absolute immunity from any defamation actions
resulting from a report that they were required to make to a
Government agency.  Here, they assert that they are subject to
the reporting requirements of the National Industrial Security
Program Operations Manual ("NISPOM") and have a duty to report
adverse information about persons working under their supervision
to Defense Security Services.  *See* DoD 5220.22-M at § 1-302 (Feb.
28, 2006).  The regulation requires contractors to "report
adverse information coming to their attention concerning any of
their cleared employees" but cautions that "[r]eports based on
rumor or innuendo should not be made."  *Id*.

In *Becker*, the defendant company, subject to reporting
requirements similar to those at issue here, received information

about wrongful actions taken by two of its employees.  It passed this information to the Government, as it was required to do.  As a result of the disclosure the employees temporarily lost their security clearances.  The Fourth Circuit held that under defense contracting requirements, the defendant company was required to report any suspicions it had, including "both true and false accusations" that it received.  *Id.* at 774.  Drawing an analogy between defense contractors and executive branch agencies, the Court extended an absolute privilege to the company for information forwarded to the Government under such mandatory regulations.  "[A]n action for libel will not lie . . . against a private party fulfilling its governmentally imposed duty to inform."  *Id*. at 776.

The circumstances in *Becker* are at least partially distinguishable from those present here.  *Becker* extended an absolute privilege to the contractor when the contractor was fulfilling its obligation to report.  Plaintiffs have alleged, however, that Torres fabricated the allegations against Ford and caused a report to be made by TAES against him.  Whereas in *Becker* the defendant corporation passed along information it received from a third party, the information here originated with Torres, the CEO of TAES.

While TAES may have had an obligation to report damaging information about Ford once that information was

received from Torres, Torres himself can have had no "suspicion" that Ford had engaged in wrongdoing if the allegations in the Complaint are true.  *See Becker*, 372 F.2d at 774; *see also Bridge Tech. Corp. v. The Kenjya Grp., Inc.*, 65 Va. Cir. 23, 2004 WL 1318884 (Va. Cir. Ct. Apr. 20, 2004) (holding that a corporation was entitled to absolute immunity under *Becker* even when plaintiff's complaint alleged that the corporation's statements to the government were made falsely and based on rumor and innuendo).

Under the *Becker* decision, then, TAES is immune from defamation claims based on a report it was required to file. Torres has no such immunity.  The Court notes that it is not clear from the face of the Complaint whether Count VIII was intended to reach other allegations of defamation alleged in relation to the tortious interference claim.  For this reason, Count VIII will be dismissed as to TAES without prejudice.  The Court will not dismiss the defamation claim against Torres at this time.

G. Request for Dismissal of Remaining State Law Claims

Defendants request a dismissal of the state contract law claims if the Court dismisses the federal claim brought in this action (Count VI).  As the Court has not dismissed that claim – *see supra* subpart III.D – it need not address the propriety of dismissing any related state law claims.

28

**IV.  Conclusion**

For these reasons, the Court will grant the motion to dismiss Count VIII as to TAES, without prejudice.  The Court will deny the remainder of Defendants' motion.

An appropriate Order will issue.


March 3, 2009                              _____/s/_____
Alexandria, Virginia                              James C. Cacheris
                                   UNITED STATES DISTRICT COURT JUDGE